Filed 12/11/23   T.J. v. Superior Court CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).   This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| T.J. et al., | |
| Petitioners, | E082175 |
| v. | (Super.Ct.No. DPSW2200017) |
| THE SUPERIOR COURT OF RIVERSIDE COUNTY, | OPINION |
| Respondent; | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS; petition for extraordinary writ.   Sean P. Crandell, Judge.   Petitions denied.

Laurie Minter for Petitioner, T.J.

Chrystal James for Petitioner, M.P.

No appearance for Respondent.

1

Minh C. Tran, County Counsel, Teresa K.B. Beecham and Catherine E. Rupp, Deputy County Counsel, for Real Party in Interest.

INTRODUCTION

Petitioner M.P. (mother) filed a petition for extraordinary writ pursuant to California Rules of Court, rule 8.452 challenging the juvenile court's order terminating reunification services as to her children, X.J. and Z.J. (the children), and setting a Welfare and Institutions Code[1] section 366.26 hearing.   She contends the Riverside County Department of Public Social Services (DPSS) did not provide her with reasonable services and that the court erred in finding it would be detrimental to return the children to her care.   Petitioner T.J. (father) has filed a separate writ petition similarly arguing that DPSS did not provide him with reasonable services, and the court erred in terminating his services and finding that placement of the children with him would create a substantial risk of detriment.   They both request a temporary stay of the section 366.26 hearing, pending the granting or denial of their writ petitions.   We deny the request for a stay and also deny the writ petitions.

PROCEDURAL BACKGROUND

On July 26, 2022, DPSS filed a section 300 petition, alleging that the children came within the provisions of subdivision (b) (failure to protect).   At that time, X.J. was seven years old and Z.J. was 10 months old.   The petition alleged that mother and father

---

[1]   All further statutory references will be to the Welfare and Institutions Code, unless otherwise indicated.

2

(the parents) engaged in severe acts of domestic violence in the children's presence, causing X.J. to intervene by hitting mother in an attempt to stop the fighting. The petition also alleged that the parents had a prior welfare referral history for domestic violence and failed to benefit from services, that they both abused controlled substances, and that they both had criminal histories, which included arrests for domestic violence and child endangerment offenses.{CT 60-64}

The social worker filed a detention report, recommending that the children be detained and the parents have supervised visitation.{CT 33-35} The social worker reported that DPSS received a referral on July 19, 2022, due to a domestic violence incident, and law enforcement responded to the parents' residence. According to the police report, both parents reported engaging in a physical altercation. Father reported that mother was the aggressor, he started recording her with his cell phone, and she slapped the phone from his hand, scratched his neck, and kicked him in the head. Their daughter, X.J., began yelling at mother and hit her over the head with a metal water bottle.{CT 17} Mother reported that father had been drinking most of the day and, when she asked him why he was drinking so much, it caused tension, so they took the children to the park. Mother said, upon their return, X.J. wanted to watch online videos, was upset, and swung a metal flask at her, hitting her in the head.{CT 17}

The social worker interviewed mother on July 21, 2022. Mother said the day of the incident was stressful, and she drank a wine cooler. She said X.J. was not listening to her, so she asked father for help. Mother could not remember what happened, except that she and father got into an argument, and X.J. was mad because of it. Mother could

3

not recall any other details but just remembered that X.J. struck her on the head.{CT 17-18}   She denied having any issues with drugs or alcohol but said father drinks too much.{CT 18}

The social worker also interviewed father, who referred to himself as an alcoholic, and said he smoked marijuana and had a history of methamphetamine use.{CT 18} Father reported that he and mother were " 'buzzed' " on the day of the incident, as mother drank three wine coolers and mixed them with her medication, which contributed to her hostile and aggressive behavior.   Father said she pushed him against the wall and grabbed his neck with her nails, and he fell to the floor.   While mother was hunched over, X.J. hit her on the head.   Father said he started recording a video on his cell phone when things got " 'heated,' " and he showed the social worker the videos.{CT 18}   The video clips showed mother and father engaging in an argument.   One of the clips showed X.J. "screaming, crying, and yelling in distress," apparently after hitting mother on the head.{CT 19}   In another video, mother was holding Z.J. and asking why she was bleeding and who hit her.   Both children could be heard crying and panicking in the video.{CT 19}   Mother was arrested and charged with inflicting corporal injury on a spouse and child endangerment.{CT 23}

The social worker interviewed X.J. at the maternal grandmother's home.   X.J. explained that the parents were fighting about drinking, mother scratched father, and father pushed mother to the floor.   She said that, while mother was on the floor, father hit mother on the head with his hand.{CT 20}

4

In light of the domestic violence incident, DPSS placed the children in protective custody in the home of the maternal grandparents.{CT 13, 21}

The social worker reported on the parents' prior history. On November 6, 2018, DPSS received a referral for general neglect and domestic violence. Mother had contacted law enforcement to report an incident of domestic violence. The police observed a cut to her nose and bruising to her face and right hand. The referral was substantiated for father but unfounded as to mother.{CT 22} On August 12, 2019, DPSS received another referral, as mother contacted law enforcement to report that father had been drinking and began to fight with her, biting her on the hand and breaking items in the home. X.J. (age 4) witnessed the domestic violence incident.{CT 22} Father was charged with domestic violence and child endangerment, and mother was charged with domestic violence. Mother failed to appear at court, and the case was still pending.{CT 23} Father pled down to two charges of malicious disturbance of another person by loud noise and was on probation until July 20, 2023.{CT 24, 137}

The court held a detention hearing on July 28, 2022, and detained the children in the maternal grandparents' home, with the plan to move them to the home of the maternal great-grandparents.{RT 11, 15, 17} The court ordered separate visitation for the parents, supervised by the maternal grandmother, twice a week. It also ordered that substance abuse treatment and testing, parenting education, and counseling services be provided pending further proceedings.{RT 17-18, CT 27, 33}

*Jurisdiction/Disposition*

The social worker filed a jurisdiction/disposition report on August 16, 2022, recommending that the court sustain the petition, declare the children dependents, and order reunification services for mother and father.{CT 126}   The social worker reported that the children were placed in the home of the maternal great-grandparents on July 28.{CT 127}   She also reported that a visit was scheduled on August 5, at the DPSS office, and the parents visited the child, Z.J., separately.   However, X.J. refused to go to the visit.{CT 148}   The social worker spoke with her, and she said she did not want to visit with the parents at that time but might want to the following week.{CT 148}   The parents said they understood why X.J. did not want to visit and indicated they spoke with her on the phone almost daily.{CT 148}   On August 12, the maternal great-grandparents said they did not feel comfortable supervising visits at their home.{CT 148}

The social worker reported that, on August 1, 2022, mother and father were referred to counseling services and domestic violence services through Marsell Consulting (Marsell), and to parenting education and substance abuse services through MFI Recovery Center (MFI).{CT 149, 344, 345}   On August 12, both mother and father stated they were enrolled in counseling and domestic violence services and had signed up for an online parenting class.   They both said they did not need substance abuse services.{CT 150, 154}

The court held a jurisdiction/disposition hearing on August 19, 2022.{RT 21} The parents set the matter contested and requested that the maternal grandmother be authorized to supervise the visits at her house, without the maternal grandfather present,

6

since he had a nonexemptible criminal case against him.{RT 22-23}   The court authorized DPSS to permit the maternal grandmother to supervise visits at her home, if it deemed that appropriate.   The court set the contested hearing for September 29.{RT 24} The matter was later continued to October 19.{RT 29}

DPSS filed an amended petition on October 19, 2022, that essentially amended the allegations under section 300, subdivision (b), to specifically state that, on July 18, the parents engaged in an act of domestic violence in the children's presence, where mother pushed and scratched father, which resulted in his sustaining injuries to his neck and caused X.J. to intervene by hitting mother in an attempt to stop them; mother was arrested for battery on a spouse.{CT 267}   Both mother and father filed "Waiver of Rights" forms and submitted on the amended petition.{CT 275-278}

That same day, the court held the contested jurisdiction/disposition hearing.{RT 30}   The social worker informed the court that the maternal grandmother no longer wanted visits to take place at her home.{RT 31}   The maternal great-grandmother added that it was because the maternal grandmother did not want to supervise the visits anymore.{RT 32}   Mother's counsel noted that mother's visits had recently been changed back to the DPSS office, and requested that mother have her visits either "in the community" or at the maternal great-grandparents' home.{RT 33}   Both mother and father acknowledged they were waiving their rights and submitting on the amended petition, and county counsel informed the court that the amended petition was negotiated by the parties.{RT 35-36}   The court found true the allegations, sustained the amended petition, and then declared the children dependents of the court.   It removed the children

7

from the parents' custody and ordered mother and father to participate in reunification services.{RT 38-39}   Both of their case plans included the requirements that they participate in individual counseling, complete a domestic violence program, complete a parenting education program, and participate in a substance abuse program, including substance abuse testing.{CT 158-163}   The prior visitation orders were to remain in effect.{CT 181, RT 39-40}   The court authorized the maternal grandfather to be present for visits, as long he was not left alone with the children.{RT 42-43}

*Six-month Status Review*

On April 6, 2023, the social worker filed a six-month status review report, recommending that the children remain dependents of the court, and the court terminate both parents' reunification services and set a section 366.26 hearing.{CT 325-326}   The social worker reported that the parents agreed to meet on December 9, 2022, to review their case plans after their visits that day.   However, father called to cancel the meeting for both him and mother and rescheduled visits for December 12.   On December 12, mother contacted the social worker to say she could not meet due to car troubles and rescheduled for December 15.   On December 15, she failed to show up.{CT 342-343} She also either cancelled or failed to appear at two other scheduled meetings.{CT 343} On March 8, 2023, the social worker met with mother, and mother said she was not interested in the case plan services and refused to accept a copy of the case plan or referral letter.{CT 343}

The social worker further reported that mother had been referred to MFI for substance abuse treatment and testing but adamantly refused to participate.   She was

8

given the opportunity to choose an alternative program, with DPSS's approval.{CT 344} However, on January 11, 2023, mother completed the MFI assessment, tested positive for opiates, and qualified for treatment; but she indicated she did not need a substance abuse program and refused to enroll.{CT 344} Mother did submit to substance abuse testing numerous times from September 2022 to March 2023, but failed to test five times during that period. The social worker noted that mother was banned from testing at certain facilities due to being verbally aggressive with staff and not complying with regulations.{CT 344-345} The social worker reported that mother was referred to PPP Parenting Services on August 8, 2022, but there was no record of her enrolling or participating in the program.{CT 345} She was referred to individual counseling at Marsell and, on February 2, 2023, a counselor reported that she completed her counseling with no concerns.{CT 345} Mother was also referred to Marsell for a domestic violence program. She was participating but was discharged on March 15, due to poor attendance, and she was re-enrolled on March 30.{CT 346} The social worker noted that mother continued her unhealthy relationship with father and expressed her intent to stay in that relationship.{CT 346}

The social worker reported that father repeatedly refused to enroll in services, stating that he was the victim.{CT 347} Throughout the review period, the social worker tried to review the case plan with him, but father failed to attend five scheduled meetings.{CT 347} Father was referred to MFI for substance abuse treatment and testing, completed his assessment on January 11, 2023, and qualified for treatment; but, he did not enroll and indicated he did not need a substance abuse treatment program.{CT

348} Father submitted to multiple substance abuse tests from September 2022 to March 2023, failed to appear three times, and tested positive for marijuana on January 11 and March 9, 2023.{CT 348-349} As to the parenting education requirement, father said he enrolled in PPP Parenting Services on August 8, 2022. However, PPP reported there was no record of enrollment, participation, or completion for him.{CT 349} Father was referred to Marsell for individual counseling and a domestic violence program, and he started services in August 2022. On March 1, 2023, Marsell reported that he was discharged due to lack of attendance. Father had 16 individual therapy sessions scheduled and did not show up for any of them.{CT 349-350} The social worker further reported that father was arrested on March 29, 2023, and charged with inflicting corporal injury on a spouse.{CT 350, 481} According to the police report, mother and father were drinking at a saloon together and got into an argument. Mother called a Lyft driver, who reported that he saw father shove mother to the ground with both hands. Mother landed on her back, hit her head, and appeared to lose consciousness.{CT 502-503}

Additionally, the social worker reported that, on October 12, 2022, X.J. contacted her to report that father and Z.J. fell into the pool at the maternal grandmother's home. Father's popsicle fell into the pool and Z.J. went in to get it. Father told X.J. not to tell anyone. The social worker moved the visits to the DPSS office temporarily, due to concerns about what occurred.{CT 351} The social worker informed the parents the visits would be moved, and both father and mother said X.J. was a liar. The social worker had to end the call with father because he was irate, combative, and "unable to

have a civil conversation."{CT 351-352}   Subsequently, father had a visit scheduled with X.J. on November 9, 2022, but the maternal great-grandmother informed the social worker that X.J. was crying and saying she did not want to go.   X.J. ended up going, but father did not show; and X.J. said she no longer wanted to visit him.{CT 352}

On December 14, 2022, a Child Family Team Meeting (CFTM) was held to discuss the issue of the parents' inconsistent visitation.   It was established that father would visit X.J. from 1:00 p.m. to 3:00 p.m. and mother would visit from 3:00 p.m. to 5:00 p.m.{CT 354}   On December 15, the social worker went to see X.J. at school and noted her demeanor changed when discussing the parents, as she became guarded and quiet.{CT 354}   On December 22, the maternal great-grandmother and the social worker agreed that the visits should be moved to the DPSS office to be supervised by DPSS, as the maternal great-grandmother had observed father being aggressive and inappropriate with the social worker at the last visit in her home.{CT 354-355}   On December 30, both mother and father did not attend their scheduled visits with the children.{CT 355}   On January 5, 2023, mother notified the social worker that neither she nor father would attend the scheduled visit.{CT 355}   On February 8, X.J. said she no longer wanted to visit the parents.   When asked for a reason, she just said she did not want to do so.{CT 355}   On February 14, both parents cancelled their scheduled visits due to work issues. Their visits were rescheduled for a few days later, and they both cancelled their rescheduled visits.{CT 355-356}   On February 21, the maternal great-grandmother cancelled the visits due to Z.J.' being sick; the parents were offered a virtual visit, but did not respond.{CT 356}   On February 23, the social worker asked X.J. how visits were

going, and she said she did not enjoy visits with the parents; however, she said she would visit if the maternal great-grandmother was present.{CT 356}   However, on March 8, X.J. called the social worker to say she was not going to visit with the parents, since she did not like being in a room with them.{CT 356}   The parents did visit with Z.J. on that day for the first time in a month, and he seemed anxious every time mother or father came near him.{CT 356}   Mother's visit reportedly went well toward the end, but father ended his visit prematurely because he could not get Z.J. to stop crying.{CT 357}   On March 29, X.J. again refused to visit with either parent, saying she did like not the visits. The maternal great-grandmother brought Z.J. to the DPSS office for the scheduled visit, but both parents failed to show.{CT 357}

The social worker filed an addendum report on June 22, 2023, and reported that, since the last hearing, mother continued to participate in her services; however, she had not attended the last three sessions of her domestic violence program.   Furthermore, despite several attempts to obtain a signed consent from her to complete the referral process for a substance abuse program, mother failed to make herself available to sign the documents.   She also failed to attend a drug test on June 7.   Father similarly had not made himself available to sign the documents needed for the substance abuse program. He missed four sessions of his domestic violence program and 10 sessions of individual therapy.{CT 614, 617}

As to visitation, the social worker reported that DPSS and the caregiver had been flexible with the parents and offered tele-video visits; however, father only attended some of his tele-video visits with Z.J.   Father was asked to provide a list of times for visits, but

12

he had yet to do so.{CT 618}   Mother had terminated her in-person visits and attended tele-video visits.   The social worker opined that the parents failed to make visitation a priority.{CT 618}   The social worker further reported that mother and the maternal grandmother had conspired to plan unauthorized visits during the maternal grandmother's visits.{CT 620}   The social worker also reported that DPSS had received numerous concerns from the maternal great-grandmother regarding the parents' volatile temperament and lack of cooperation during their visits.   The social worker opined that the parents lacked insight on how their behavior impacted their children and their ability to provide a safe and stable environment.{CT 620}

The court held a six-month review hearing on June 29, 2023.{RT 305}   The current social worker assigned to the children's case was called as a witness by father. He said he was assigned to the case four months prior, and there were four other social workers before him.{RT 308}   The social worker confirmed that a previous social worker had inputted father's name incorrectly in submitting a referral.[2]{RT 310}   The referral with the wrong last name was submitted in August, father was enrolled, the referral was dropped in October, and he had to be re-enrolled.{RT 311}

The social worker further testified that the parents had not been consistent in their visits, and it was extremely difficult to set a schedule, since they would often ask for different dates.{RT 413-414}   He noted that they had been asking for more visits in the

---

[2]   The previous social worker apparently put father's first name with mother's last name; however, mother and father had different last names.{RT 310}

13

community, so there had been some lately, which were supervised by the maternal great-grandmother.{RT 421}   The social worker said he set up a visit with Z.J. at a restaurant, and after that one went well, X.J. said she wanted to have community visits with mother; so he set up a visit between her and mother at a pottery store.{RT 421}   On cross-examination, the social worker testified that he would always ask X.J. if she wanted to visit, and there was a period of time when she declined to have visits, even in the community.{RT 431}   He testified that the parents initially had visits at the maternal great-grandmother's home, but there was an incident with a prior social worker where father "got right up in that social worker's face."{RT 431-432}   At that point, the maternal great-grandmother felt uncomfortable having the visits in her home, and the visits were moved to the DPSS office for a substantial period of time.   Then, DPSS made the decision to allow visits in the community to occur again.{RT 432-433}   However, the visits were currently back in the DPSS office due to the parents' behavior of constantly arguing with the maternal great-grandmother and X.J.{RT 434-435}

After considering the evidence and hearing closing arguments, the court remarked that the parents denied they needed help, refused to participate in services, and simply looked for ways not to comply.{RT 544}   The court found that DPSS had provided reasonable services, the parents failed to participate regularly and make substantial progress in their case plans, and there was no substantial probability the children would be returned to their custody if given additional services.   It also found that the children were a sibling set, since one of them was under the age of three at the time of the initial

14

removal.{RT 549-550}   The court terminated the parents' reunification services and set a section 366.26 hearing.{RT 550}

DISCUSSION

<u>The Court Properly Terminated the Parents' Reunification Services and Set a Section 366.26 Hearing</u>

Mother and father both argue that the court erred in terminating their services and setting a section 366.26.   They each contend they were not provided with reasonable services, and the court erred in finding it would be detrimental to return the children to their custody.   We conclude they were both provided with reasonable services and failed to substantially complete their case plans and make substantive progress.   Therefore, the court properly found it would be detrimental to return the children to their custody, terminated their services, and set a section 366.26 hearing.

A.   *Relevant Law*

"At the review hearing held 6 months after the initial dispositional hearing, . . . the court shall order the return of the child to the physical custody of their parent . . . unless the court finds, by a preponderance of the evidence, that the return of the child to their parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child."   (§ 366.21, subd. (e)(1).) "The failure of the parent . . . to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental."   (*Ibid*.)

15

"If the child was under three years of age on the date of the initial removal, or is a member of a sibling group described in subparagraph (C) of paragraph (1) of subdivision (a) of Section 361.5, and the court finds by clear and convincing evidence that the parent failed to participate regularly and make substantive progress in a court-ordered treatment plan, the court may schedule a hearing pursuant to Section 366.26 within 120 days." (§ 366.21, subd. (e)(3).) "If, however, the court finds there is a substantial probability that the child . . . may be returned to their parent within six months or that reasonable services have not been provided, the court shall continue the case to the 12-month permanency hearing." (*Ibid.*)

B. *The Parents Were Provided with Reasonable Services*

Mother and father both argue that DPSS did not provide reasonable services due to issues with visitation. {Mother's Writ (MW) 9-11; Father's Writ (FW) 10} Mother contends she was not provided with reasonable services because DPSS did not liberalize her visits, as she had supervised visits at the DPSS office for the majority of the case, and DPSS prevented her from ever progressing to unsupervised visits. {MW 9, 11} Father claims that he was not given a reasonable opportunity to visit the children, and that DPSS was unwilling to change the location of his visits from the DPSS office. {FW 12} He also claims there was an eight-week delay in receiving counseling services due to DPSS's error in listing the wrong last name for him in the referral. {FW 11} We conclude that mother and father were provided with reasonable services.

16

1. *Standard of Review*

"On appeal, it is our task to determine whether the record discloses substantial evidence which supports the juvenile court's finding that reasonable services designed to aid the parent in overcoming the problems which led to loss of custody were provided or offered." (*In re Joanna Y.* (1992) 8 Cal.App.4th 433, 439.) "In reviewing the reasonableness of the services provided, this court must view the evidence in a light most favorable to the respondent. We must indulge in all legitimate and reasonable inferences to uphold the verdict. If there is substantial evidence supporting the judgment, our duty ends and the judgment must not be disturbed." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545 (*Misako R.*).)

2. *Mother and Father Were Offered Consistent Visitation*

Mother's and father's case plans required them to complete individual counseling, a domestic violence program, a parenting education program, and a substance abuse program, including testing.{CT 158-163} They were referred to counseling services and domestic violence services through Marsell, and parenting education and substance abuse services through MFI.{CT 149, 344, 345} The parents do not complain about the reasonableness of any of these services.

Instead, mother specifically contends she was not provided with reasonable services because DPSS restricted her visits to supervised visitation at DPSS offices, which resulted in X.J. refusing to have visits with her. In other words, she claims X.J. refused visitations "due to not wanting to be at the DPSS office." Mother notes that DPSS did not allow her to move to community visits until just weeks before the review

17

hearing. She points out that, as soon as she was allowed to have visits in the community, X.J. decided to participate in visits with her.{MW 9, 10} Additionally, mother claims DPSS prohibited the maternal grandmother from continuing to supervise her visits because the social worker mistakenly believed the maternal grandmother was colluding with her to provide her with unauthorized visits.{MW 9-10} Father similarly claims he had visits for months with both children when they were supervised by the maternal grandmother; however, when DPSS withdrew the authorization for her to supervise and visits went back to the DPSS office, X.J. would no longer visit with him.{FW 12}

The record plainly belies mother's and father's claims. On July 28, 2022, the court ordered separate visitation twice a week and subsequently authorized the maternal grandmother to supervise.{RT 18, CT 148} On August 1, the social worker attempted to schedule visits, but mother did not answer the phone. Father was uncooperative with the social worker and disconnected the phone call.{CT 148} On August 5, the parents visited Z.J. separately at the DPSS office, but X.J. refused to go and simply said she did not want to visit.{CT 148} The court subsequently authorized the maternal grandmother to supervise visits at her home, and both mother and father later reported that the visits were going well.{RT 24, CT 213} However, on October 12, X.J. reported to the social worker that father and Z.J. fell into the pool at the maternal grandmother's home. The social worker informed the parents that the visits would be moved back to the DPSS office temporarily, due to concerns about what happened, and both father and mother called X.J. a liar.{CT 351-352} At the contested jurisdiction hearing on October 19, the

18

court was informed that the maternal grandmother no longer wanted to supervise visits and did not want visits to take place at her home.{RT 31-32}

On November 9, 2022, father had a visit scheduled with X.J., but she was crying and said she did not want to go. She ended up going, but father did not show, and X.J. said she no longer wanted to visit him.{CT 352}

The parents' visitations became more inconsistent, and on December 14, 2022, a CFTM was held to discuss the issue.{CT 354} The maternal great-grandmother agreed with the social worker that the visits should be moved to the DPSS office to be supervised by DPSS, as she had observed father being aggressive and inappropriate at the last visit in her home.{CT 354-355} Subsequently, the parents missed several of their scheduled visits, and X.J. said she no longer wanted to visit with them. When asked for a reason, she just said she did not want to do so.{CT 355-356} On February 21, 2023, the maternal great-grandmother cancelled the visits due to Z.J. being sick, and the parents were offered a virtual visit but did not respond.{CT 356} X.J. told the social worker several times that she did not enjoy visits with the parents and refused to go at various times.{CT 356-357} The parents had a visit with Z.J. on March 8, but they then failed to show for a scheduled visit on March 29.{CT 357} The record reflects that DPSS was flexible and offered the parents tele-video visits; however, they only attended some.{CT 618}

Furthermore, at the review hearing, the social worker confirmed that the parents were not consistent in their visits.{RT 413-414} He noted there had been some visits in the community lately, supervised by the maternal great-grandmother, which included

19

X.J.{RT 421, 431}   The social worker testified that there was a time when X.J. declined to have visits, even visits in the community.{RT 431}   He testified that the parents had visits at the maternal great-grandmother's home, but the visits were moved to the DPSS office since the maternal great-grandmother felt uncomfortable having the visits in her home.   At some point, DPSS did allow visits in the community to occur again.{RT 431-433}   However, at the time of the review hearing, the visits were back in the DPSS office, due to there being constant arguments between the parents, the maternal great-grandmother, and X.J.{RT 434-435}

Thus, contrary to the parents' claims, the record clearly shows they were offered regular and flexible visitation, but they were inconsistent in attending the visits.   Further, X.J.'s refusal to visit with them had nothing to do with the location of the visits; rather, she said several times she did not like visiting with them.   Moreover, DPSS did not prohibit the maternal grandmother from supervising visits or prevent mother from progressing to unsupervised visits.   Rather, the maternal grandmother did supervise visits for a time, but then no longer wanted to supervise visits.   The visits remained supervised due to the circumstances and the parents' inappropriate behavior.   As to father's claim that he suffered an eight-week delay in receiving counseling services because of DPSS's error in listing the wrong name on the referral, any error was harmless, since he never attended any of the counseling sessions he was offered thereafter.{FW 10}   (See *supra*, § C.2.)

Ultimately, "[t]he standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the

circumstances." (*Misako R., supra*, 2 Cal.App.4th at p. 547.) Construing all reasonable inferences in favor of the juvenile court's findings regarding the reasonableness of DPSS's efforts, as we must, we conclude the services provided to mother and father were reasonable under the circumstances. (*Ibid.*)

      C. *The Court Properly Terminated the Parents' Reunification Services*

Mother contends the court erred in terminating her services since she substantially completed her case plan, there was no evidence she failed to regularly participate or make substantive progress, and there was a substantial probability that, given six more months of services, the children would have been returned to her care.{MW 7-9} Father similarly claims he substantially completed his case plan, and there was no substantial evidence that, given six more months of service, he would not be able to reunify with the children.{FW 13-15} They both claim they were actively participating in their substance abuse treatment programs, participating in testing, and having positive visits with the children.{MW 9, FW 15} The record simply does not support their claims, and there was substantial evidence to support the court's order terminating services.

      1. *Standard of Review*

"We review an order terminating reunification services to determine if it is supported by substantial evidence. [Citation.] In making this determination, we review the record in the light most favorable to the court's determinations and draw all reasonable inferences from the evidence to support the findings and orders. [Citation.] 'We do not reweigh the evidence or exercise independent judgment, but merely

21

determine if there are sufficient facts to support the findings of the trial court.' " (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688-689.)

2. *Mother and Father Failed to Participate Regularly and Make Substantive Progress in Their Case Plans*

We initially note that Z.J. was under three years of age when he was removed from the parents' custody.{CT 12}   Pursuant to section 361.5, subdivision (a)(1)(B), reunification services may be limited to six months for these very young minors. (See *M.V. v. Superior Court* (2008) 167 Cal.App.4th 166, 175.)   Moreover, because X.J. is a member of Z.J.'s "sibling group," X.J.'s reunification services may be similarly circumscribed pursuant to section 361.5, subdivision (a)(1)(C).   Specifically, at a six-month review hearing, reunification services for members of a sibling group may be terminated, and a permanency planning hearing scheduled, if the juvenile court "finds by clear and convincing evidence that the parent failed to participate regularly and make substantive progress in a court-ordered treatment plan."   (§ 366.21, subd. (e)(3).)

The court here ordered mother and father to participate in individual counseling, complete a domestic violence program, complete a parenting education program, and participate in a substance abuse program and testing.{RT, 38-39, CT 158-160}   Mother initially told the social worker she was not interested in the services and refused to accept a copy of the case plan or referral letter.{CT 343}   She was referred to MFI for substance abuse treatment and testing and adamantly refused to participate.   Although mother later completed the MFI assessment, she refused to enroll.{CT 344}   Mother did submit to substance abuse testing several times from September 2022 to March 2023, but

22

missed five tests during that period.{CT 344-345}  She was referred to a parenting program in August 2022, but there was no record of her enrolling or participating in it.{CT 345}  She enrolled in a domestic violence program, but she was discharged due to poor attendance.{CT 346}  By the time of the six-month review hearing, mother had only completed her counseling requirement.{CT 345}

Similarly, father completed an assessment at MFI for substance abuse, but he did not enroll and indicated he did not need a substance abuse treatment program.{CT 348} He submitted to several substance abuse tests and tested positive for marijuana twice.{CT 348-349}  Father said he enrolled in a parenting program in August 2022, but there was no record of enrollment, participation, or completion.{CT 349}  He was referred to Marsell for individual counseling and a domestic violence program, and he started services in August 2022, but was later discharged for lack of attendance.  He had numerous sessions of individual therapy scheduled and did not show up to any of them.{CT 349-350}  As to the domestic violence program, Marsell reached out several times to schedule father for continued services, but he did not respond.{CT 350} Moreover, father was arrested on March 29, 2023, and charged with inflicting corporal injury on a spouse.{CT 350, 481}  Thus, he evidently had not benefited from the services.

On this record, it is clear that mother and father failed to regularly participate or make substantive progress in their case plans, and there was no substantial probability that, given six more months of services, the children would have been returned to their

23

care.   Therefore, the evidence supported the court's decision to terminate their reunification services.

D.   *The Court Properly Found That Return of the Children to the Parents' Custody Would Be Detrimental*

Finally, mother and father argue that the court erred in finding there was a substantial risk of detriment to the children if returned to their care.   They assert that they had adequate housing and stable employment, and had completed the majority of their case plans.{MW 12, FW 16}

Section 366.21, subdivision (e)(1), provides that the failure of the parent to participate regularly and make substantive progress in court-ordered treatment programs "shall be prima facie evidence that return would be detrimental."   (§ 366.21, subd. (e)(1).)   In view of the parents' failure to participate regularly and make substantive progress in their case plans, the court properly concluded that return of the children to their custody would be detrimental.   (§ 366.21, subd. (e)(1).)   (See *supra*, § C.)   A thorough review of the record demonstrates that the evidence amply supports that finding.

DISPOSITION

The writ petitions are denied.   The requests for a temporary stay of the section

366.26 hearing are also denied.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS                      
                                                                                    J.

We concur:

MILLER                      
              Acting P.J.

CODRINGTON            
                J.